USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3/10/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RUTH ORTIZ,
                Plaintiff,

-against-

ANDREW SAUL, Commissioner of Social Security,

                Defendant.

1:19-cv-00942 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Ruth Ortiz brings this action challenging the Commissioner of Social Security's ("Commissioner" or "Defendant") final decision that Plaintiff was not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act or supplemental security income ("SSI") under Title XVI of the Social Security Act. 42 U.S.C. §§ 401-433. Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). ECF Nos. 11-12; 17-18. The Court has considered the Parties' submissions and for the reasons set forth below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**.

## BACKGROUND

### I. Procedural Background

On June 16, 2014, Plaintiff protectively filed applications for DIB and SSI, alleging disability beginning May 16, 2014 due to diabetes, asthma, high blood pressure, and leg

1

problems. R at 89, 97, 216-219; 220-228.[1] Plaintiff's claim was initially denied on September 12, 2014; Plaintiff subsequently timely requested a hearing on October 15, 2014. *Id.* at 104-06, 116.

Following Plaintiff's appeal of the initial unfavorable decision, ALJ Seth Grossman commenced a first hearing on June 27, 2016 and a second one on January 18, 2017. *Id.* at 166, 174. Plaintiff, who was represented by counsel, appeared and testified at both hearings. *Id.* at 72-88; 42-71. The ALJ rendered his decision February 8, 2017, finding that Plaintiff was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. *Id.* at 17. Plaintiff then requested and was denied reconsideration by the SSA Appeals Council on December 6, 2018. *Id.* at 3-5.

Plaintiff brought this action following the denied request for reconsideration on January 21, 2019. Compl. ECF No. 1. On July 29, 2019, Plaintiff moved for a judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Pl. Mot. J. Pleadings, ECF No. 11. Defendant cross moved for judgment on the pleadings on October 25, 2019. Def.'s Cross Mot. J. Pleadings, ECF No. 17. The Court now considers the Parties' motions.

## II. Factual Background

### A. Plaintiff's Background

Plaintiff was born February 9, 1961. R at 89; 216-219; 220-228. Plaintiff was fifty-three years old at the start of her alleged disability. Plaintiff reported a twelfth-grade education, but testified that she had some college education. *Id.* at 55. Plaintiff testified that she last worked for Bronx Eyecare on July 16, 2014, as an eyeglass sales associate, which, since 1985, had been her position at approximately two prior establishments. *Id.* at 46, 261. Plaintiff stopped work for a period of time between 2010 and 2011, where she testified she moved in with her parents due to

---

[1] "R" refers to the Certified Administrative Record filed at ECF No. 10. Pagination follows original pagination in the Certified Administrative Record.

her diabetes allegedly causing her numbness in her feet and knees. *Id.* at 48. She returned to work in 2012. *Id.* At the time of the hearing, Plaintiff lived with a male friend and supported herself with SNAP food stamps and occasional financial aid from her father. *Id.* at 47; 85.

**B. Alleged Disability**

Plaintiff suffers from diabetes, leg problems, asthma, and high blood pressure. *Id.* at 216-219; 220-228. In 2009, she was diagnosed with diabetes mellitus, for which she takes Metformin. *Id.* at 248. Additionally, Plaintiff experiences asthma attacks approximately three times a year. *Id.* For asthma, she is prescribed Albuterol, which she takes two or three times a day. *Id.* at 283. Plaintiff's other medications include Lisinopril for blood pressure and Pravastatin for cholesterol. *Id.* at 292.

In her function report filed August 14, 2014, Plaintiff stated that she is able to dress, bathe, care for her hair, shave, feed herself, and use the toilet without assistance. *Id.* at 276-277. She also indicated that she cares for and feeds her dog. *Id.* Plaintiff reported some difficulties sleeping due to her pain, and said that she is only able to prepare her own meals every other day. *Id.* Plaintiff further reported doing household cleaning and laundry but indicated needing help carrying the laundry basket and being unable to do yardwork because she could not stand on her feet for long periods of time. *Id.* at 278.

At the January 18 hearing, Plaintiff testified that due to her pain, she stays home all day; however, on occasion, she will go grocery shopping with her friend. *Id.* at 49. She also testified that some days she is unable to get out of bed and that her legs occasionally feel too numb to stand up. *Id.* at 84.

Plaintiff further reported that she is no longer able to go outside or walk alone, due to numbness in her legs. *Id.* at 278. Generally, Plaintiff uses a cane prescribed by a doctor, and

indicated she can only walk for fifteen minutes at a time. *Id.* at 282. Plaintiff also reported that she could not climb stairs.

At the June 27 Hearing, plaintiff testified that she worked eight-hour shifts at her job, which included both standing and sitting. *Id.* at 78. She stated that she had difficulty standing at her job due to numbness and "running pain" throughout her legs caused by her diagnosed diabetic neuropathy. *Id.* at 79. Plaintiff also testified to using a brace for her left leg, which she received because of a meniscus tear. Although she was first prescribed a cane for her neuropathy, Plaintiff testified that she now also uses it to help with balance issues resulting from her torn meniscus. *Id.*

### C. Medical Evidence in the Record

On September 10, 2014, Plaintiff visited Dr. Aurelio Salon, M.D. for an internal medicine consultative examination at the request of the SSA. Dr. Salon diagnosed Plaintiff with a history of diabetes mellitus, a history of peripheral neuropathy, a history of bronchial asthma, hypertension, hypercholesterolemia, and obesity. *Id.* at 384-85. However, the subsequent EMG/Nerve conduction study never confirmed these findings of neuropathy. *Id.* at 494-95. Dr. Salon opined that, while Plaintiff was not restricted in her ability to sit and had no difficulty rising from her seat or moving on and off the examination table, her ability to stand for long periods of time, push or pull heavy objects, or climb was restricted because of her history of diabetes mellitus and symptomatic peripheral neuropathy. *Id.* at 385. He also noted that Plaintiff had a cane for outdoor use, primarily for ambulation, balance and weight-bearing. *Id.* Without the cane, Dr. Salon opined that Plaintiff's gait was slow with a mild limp, and as a result, Plaintiff's cane was medically necessary. *Id.* at 383. Lastly, Dr. Salon opined that Plaintiff's respiratory and cardiovascular functioning was normal, but that she should avoid smoke, dust,

4

and other pulmonary irritants. *Id.* at 385. A couple of weeks later, on September 22, 2014, Internist Jason Hong, M.D. referred plaintiff to physical therapy to help her difficulty walking due to peripheral neuropathy. 386-88.

Plaintiff visited Dr. Elaine Fleck, M.D., an internist, on October 24, 2014. *Id.* at 441. Plaintiff complained of leg weakness, numbness, and heaviness, and asthma symptoms increasing in severity. *Id.* at 441-445. Plaintiff reported that she was using Gabapentin and Motrin for her pain, and was undergoing physical therapy. *Id.* Plaintiff stated that she had used Albuterol three times a week in the preceding month to abate her asthma, saying that she believed the dropping temperatures were making her asthma worse. *Id.* Dr. Fleck noted that Plaintiff smoked daily. *Id.* Dr. Fleck also noted Plaintiff did not appear to have cardiovascular abnormalities, had an improved gait from her prior visit, and decreased sensation from her knees down. *Id.* at 444. Dr. Fleck advised Plaintiff to continue physical therapy. *Id.*

On November 23, 2014, Plaintiff visited the emergency department complaining of a lump on her upper back, as well as left knee pain that was swelling and warm to the touch. *Id.* at 452. Treatment notes indicate the pain became worse with movement and weight-baring. *Id.* Plaintiff was given pain medication to increase comfort and reduce swelling. *Id.*

Plaintiff first visited Dr. Alvin Orodio, physical therapist, on October 14, 2014. *Id.* at 389. He is described as having a "treatment relationship" with Plaintiff. *Id.* at 24. In Dr. Orodio's questionnaire dated December 5, 2014, he indicated that Plaintiff, as a result of her diagnosis of diabetes with peripheral neuropathy and hypertension, had trouble bending, walking, squatting, balancing, and standing/sitting for extended periods of time. *Id.* at 396. Dr. Orodio opined that Plaintiff could stand for a total of twenty-five minutes a day and sit for a total of forty-five minutes a day during an eight-hour workday. *Id.* at 392. He also said Plaintiff could walk only

five to ten meters without a cane. *Id.* Finally, Dr. Orodio opined that Plaintiff should avoid humidity, extreme temperatures, wetness, and dust due to her history of asthma. *Id.*

On December 12, 2014, Plaintiff again visited the emergency department because of pain in her left leg, particularly citing weight-bearing issues. *Id.* at 415-417. Although Plaintiff was ambulatory upon arrival, she complained of impaired mobility. *Id.* at 416. The attending physician noted that Plaintiff did not display any musculoskeletal abnormalities and Plaintiff was fully weight-bearing. *Id.* at 419-20. Plaintiff was diagnosed with radiculopathy of the leg and given a five-day prescription of pain medication. *Id.* at 421-23, 426. Ultimately, Plaintiff was released, ambulatory with decreased pain in stable condition. *Id.* at 426.

The following month, on January 13, 2015, Plaintiff had a walk-in visit with internist Dr. Swathi Namburi, M.D. for persistent left knee pain and swelling. *Id.* at 457. Dr. Namburi noted that Plaintiff arrived with a cane, walking with noticeable pain. 455. Dr. Namburi further noted that Plaintiff had limited range of motion in her left leg without significant pain, swelling in both legs, tenderness of the left thigh, and full range of motion in her right leg and ankle. *Id.* at 455-56. A few months later, on March 11, 2015, Plaintiff underwent an MRI of her left knee, which showed that Plaintiff had mild osteoarthritis with joint effusion. *Id.* at 475.

On June 8, 2015, Plaintiff returned to the emergency room due to left knee pain. *Id.* at 427. Plaintiff arrived with a cane and complained of difficulty bearing weight. *Id.* However, upon examination, the attending physician noted that Plaintiff was able to bear full weight. An X-Ray of Plaintiff's left knee indicated mild-to-moderate osteoarthritis with a subacute fracture of the medial tibial plateau, edema, and radial tear in the medial meniscus. *Id.* at 476. Plaintiff was diagnosed with mild osteoarthritis with joint effusion and discharged with a recommendation of physical therapy. *Id.* at 427-35.

Plaintiff had a follow-up visit with Nurse Mary Cabico September 4, 2015, where she self-reported recurring knee swelling and pain, as well as numbness in her legs. *Id.* at 473-77; 460. Plaintiff mentioned that she had been referred for physical therapy but that she had not attended any recommended sessions. *Id.* at 470. Although Plaintiff's gait was unsteady upon appearing at the emergency room, she had forgotten her cane at home. *Id.* at 481. The attending nurse noted that Plaintiff had missed a prior follow-up appointment scheduled at her last visit. *Id.* at 481. The nurse reported motor skills at 5+/5+ in all four of Plaintiff's extremities, with deep tendon reflexes in all extremities. *Id.* at 474.

At Plaintiff's subsequent November 25, 2015 appointment, the attending nurse noted Plaintiff had a degenerative meniscal tear in her left knee and a new left-sided sensory defect and left toe weakness. *Id.* at 483. The attending nurse also noted that Plaintiff's diabetic neuropathy was "presumed" and also improved for several years. *Id.* at 483. Plaintiff visited Dr. Allen Meisel, M.D. only once on August 12, 2016. Plaintiff had complaints of asthma, symptoms related to her diabetes condition, and bilateral knee pain. *Id.* at 677. Dr. Meisel's examination showed that Plaintiff's spine had full range of motion in the cervical and thoracic region, with a limited range of motion in her lumbar spine. *Id.* at 678. Dr. Meisel noted no tenderness, muscle spasm, or trigger points. *Id.* Dr. Meisel also noted that Plaintiff's gait was antalgic with and without her cane, and that Plaintiff was unable to walk on her heels or toes. *Id.* When filling out a residual functional capacity questionnaire, Dr. Meisel asserted that Plaintiff was unable to lift or carry any weight whatsoever, sit for six hours at one time, and walk or stand for a combined six hours at three hours each during an eight-hour workday. *Id.* at 681. He stated that Plaintiff could occasionally reach, handle, push and pull, and could never climb stairs, ramps, ladders, or balance, stoop, kneel, crouch, or crawl. *Id.* at 682-683.

### D. Opinions at the Hearings

Dr. Plank,[2] impartial medical expert ("ME"), testified at the second hearing of January 18, 2017 that he is a Board-Certified Orthopedic Surgeon and reviewed the medical evidence of record as well as Plaintiff's previous hearing testimony. *Id.* at 52. Dr. Plank testified that he did not see any indication that Plaintiff's diabetes was "out of control" and that Plaintiff's oral diabetes medications posed no apparent complications. *Id.* He found that there was insufficient evidence to support a diagnosis of peripheral neuropathy due to her diabetes, but that, even if physical examinations did indicate sensory loss consistent with neuropathy, this would not "be something that would keep [someone] from putting on a well-fitted pair of shoes and walking on both legs and doing things." *Id.* at 53. Dr. Plank stated that the record shows Plaintiff having mild degenerative disc and joint disease of her lumbar, thoracic and cervical spine. *Id.* at 50. He also noted "early tri-compartmental osteoarthritis in both knees, with associated meniscal tear in the left knee." *Id.* at 51. However, Dr. Plank opined that the nature of Plaintiff's osteoarthritis was "typical for someone of the claimant's age." *Id.* On the subject of Plaintiff's ambulatory ability, Dr. Plank stated that he did not believe the cane was medically necessary. *Id.* at 51, 53. Dr. Plank found that the absence of evidence of motor-sensory loss in Plaintiff's legs, significant weakness in Plaintiff's legs or issues with Plaintiff's equilibrium in the medical record did not support Plaintiff's medical need for a cane. *Id.* at 50-51.

At the same hearing, Christine DiTrinco served as the Vocational Expert ("VE"). *Id.* at 44. Ms. DiTrinco testified that in Plaintiff's line of work, use of a cane did not seem to pose any issues. *Id.* at 65.

---

[2] The ALJ's decision dated February 8, 2017 refers to the testifying Medical Expert as Dr. John F. Kwock; however, as indicated by the Defendant, this appears to be a typographical error as Dr. Plank is the only Medical Expert on record testifying at the January 18, 2017 hearing. R. at 42.

# LEGAL STANDARD

## I. Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted).

## II. Commissioner's Definition of Disability

### A. Definition of Disability

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) *accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that

[the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

### B. The Commissioner's Five-Step Analysis on Disability Claims

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4). First, the Commissioner determines whether the claimant is employed. *Curry*, 209 F.3d at 122. Second, if the claimant is unemployed, the Commissioner considers whether the claimant has a "severe impairment" that "significantly limits his physical or mental ability to do basic work activities." *Id.* Third, if the claimant suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations, meaning it conclusively requires a determination of disability. *Id*; *see also* 20 C.F.R., Part 404, Subpart P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ("RFC") to perform her past work. *Curry*, 209 F.3d at 122. Finally, if the claimant is unable to perform his past work, the Commissioner determines whether there is other work which the claimant could perform. *Id.*

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (citations omitted). At step five, however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in

the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560).

### III. The ALJ's Decision

First, ALJ Grossman concluded that Plaintiff had not engaged in substantial gainful activity since May 16, 2014, the alleged onset date of her disability. R at 19.

Second, the ALJ concluded that Plaintiff has the following severe impairments: history of diabetes mellitus, asthma, high blood pressure, and bilateral knee osteoarthritis. *Id.*

Third, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R at 20. *Id.* at 20.

Fourth, ALJ Grossman found that Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work – her past work as an eyewear Sales Attendant – as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except that she should not be "exposed to dust, chemicals, or any other environmental pollutants." R. at 20. Plaintiff was determined to need a cane only to walk outside or on uneven terrain. *Id.* ALJ Grossman found Plaintiff able to perform her work based on her residual functional capacity, since the work did not require the performance of work-related activities precluded by her RFC. *Id.* at 27. Therefore, the ALJ found Plaintiff not to be under a disability from May 16, 2014, through the date of his decision, and his analysis concluded at Step Four of the analysis. *Id.*

## DISCUSSION

Plaintiff asserts that Defendant's determination that Plaintiff was not disabled was legally erroneous, offering several arguments in support. First, Plaintiff contends that ALJ Grossman's

11

findings were not supported by substantial evidence because the identified environmental limitations were not presented to the VE at Plaintiff's hearing. Second, Plaintiff contends that the ALJ failed to give proper explanation for discounting the medical opinions of Dr. Meisel and Dr. Orodio in making his determination of Plaintiff's RFC. Finally, Plaintiff argues in the alternative that, should this Court decline to rule in Plaintiff's favor on the merits of her case, this matter should be remanded for further administrative proceedings because the presiding ALJ was improperly appointed. The Court will address each argument in turn.

I.   **The ALJ's Step 4 Disability Determination was Supported by Substantial Evidence**

Generally, "[a] nonexertional limitation is one imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain." *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir. 1999) (quoting *Sobolewski v. Apfel,* 985 F.Supp. 300, 310 (E.D.N.Y. 1997)). The Second Circuit has explained "[a] nonexertional impairment will 'significantly limit' a claimant's range of work 'when it causes an additional loss of work capacity beyond a negligible one, or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Woodmancy v. Colvin,* 577 F. App'x. 72, 75 (2d Cir. 2014) (summary order) (quoting *Zabala v. Astrue,* 595 F.3d 402, 411 (2d Cir. 2010)). Accordingly, "[t]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the [SSA] guidelines." *Bapp v. Bowen,* 802 F.2d 601, 603 (2d Cir. 1986). Instead, investigation through vocational testimony is only needed when a claimant's nonexertional impairments "diminish his ability to work *over and above* any incapacity caused solely from exertional limitations." *Id.* (emphasis added); *see also* Appendix 2 to Subpart P of 20 C.F.R. Pt. 404. In this case, Plaintiff was found to have a nonexertional limitation, but the ALJ

properly found that this limitation did not diminish Plaintiff's ability over and above any capacity caused solely by her exertional limitations.

Medical opinions and medical evidence in the record, namely related to Plaintiff's asthma, suggested that Plaintiff should avoid pulmonary irritants, which could classify as a nonexertional limitation under 20 C.F.R. § 404.1569a(c)(1)(v). The ALJ carefully considered such opinions and evidence, noting, for example, Plaintiff's asthma was "repeatedly described as mild, with only occasional exacerbations secondary to changes in the weather." R. at 21. In addition, evidence in the record demonstrated Plaintiff's ability to perform a range of light household chores, including cooking, shopping, cleaning, and laundry; Plaintiff similarly was able to use public transportation without assistance. *Id.* at 21. Courts have found these activities, along with consistent medical opinions, support a light work RFC finding. *See Williams v. Colvin*, No. 15-CV-4173, 2016 WL 3034494, at *7 (S.D.N.Y. May 26, 2016); *Browne v. Comm'r of Soc. Sec.*, 131 F. Supp. 3d 89, 101 (S.D.N.Y. 2015); *Simmons v. Colvin*, No. 13 CIV. 1724 KBF, 2014 WL 104811, at *5 (S.D.N.Y. Jan. 8, 2014). "Where, as here, the ALJ properly determines that the claimant's nonexertional impairments do not prevent the claimant from performing the full range of work contemplated by the Guidelines, the ALJ may rely on the Guidelines in directing a determination of 'not disabled' without resort to vocational expert testimony or other similar evidence . . ." *Bapp*, 802 F.2d at 605 (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984)).

The Court finds the ALJ did not err in failing to present Plaintiff's nonexertional impairments to the VE. In fact, Plaintiff's nonexertional impairments did not prevent her from performing her full range of light work. Further, Plaintiff's nonexertional impairments did not significantly limit her range of work or cause her an additional loss of work capacity. ALJ

Grossman therefore did not need to consult the VE on this issue and his decision was supported by substantial evidence. Moreover, as explained below it was permissible for ALJ Grossman to accord little weight to Dr. Orodio's opinion that Plaintiff should avoid pulmonary irritants based on his lack of status as a medical expert and his short time spent examining with Plaintiff's medical profile. *See Acevedo v. Colvin,* 20 F.Supp.3d 377, 389 (W.D.N.Y 2014).

### II. ALJ Properly Considered the Credibility of Dr. Meisel's and Dr. Orodio's Medical Opinions

Since neither Dr. Orodio nor Dr. Meisel qualify as Plaintiff's treating physician, their statements are treated as "medical opinions." *Petrie v. Astrue,* 412 Fed.App'x. 401, 407 (2d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2019)). The ALJ must consider several factors in determining how much weight to give a medical opinion. These are: (1) "the examining relationship;" (2) "the treatment relationship," including the detail and longitudinal value of the information provided, the "length of treatment relationship and frequency of examination," and "nature and extent of the treatment relationship;" (3) "supportability of the opinion in medical signs, laboratory findings … and the opinions of other treating and examining sources;" (4) "consistency with the record;" (5) "specialization" in a pertinent area of medicine; and (6) "other relevant factors," such as familiarity with the Agency disability program. 20 C.F.R. § 404.1527(c) (2019).

Opinions of physical therapists have generally been interpreted to fall into the category of "opinions from medical sources who are not acceptable medical sources." 20 C.F.R. §§ 404.1527(f)(1), 404.1513 (2019). ALJs, should they consider opinions from these sources, must use the same framework to assess these opinions as they would for medically acceptable opinions. *Id.* However, the applicability of the above factors is strongly dependent on the facts of each case. *Id.* The Presiding ALJ should "explain the weight given to opinions from these

sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow [the ALJ's] reasoning." *Id.* 404.1527(f)(2).

Plaintiff alleges that ALJ Grossman's determination is not supported by substantial evidence because the ALJ discounted, and thus did not properly consider, the medical opinions of Dr. Meisel and Dr. Orodio. The Court disagrees. "Although physical therapists are not acceptable medical sources, the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the medical evidence." *Acevedo v. Colvin,* 20 F.Supp.3d 377, 389 (W.D.N.Y 2014). Here, the ALJ determined that Dr. Orodio was not an accepted medical source, and that his assessment of Plaintiff's RFC was inconsistent with both objective medical evidence on the record and the opinions of other treating or examining physicians. R. at 24. In particular, Dr. Orodio's opinion that Plaintiff required a cane for ambulation was inconsistent with both other examining physicians' opinions finding a cane was not medically necessary and Plaintiff's inconsistent use of a cane. *Id.* at 26, 636. Additionally, Dr. Orodio's opinion that Plaintiff must avoid all exposure to pulmonary irritants in 2016 is inconsistent with evidence suggesting Plaintiff's decreased issues with asthma and pulmonary distress over time. *Id.* at 55, 57. Hence, despite Dr. Orodio's lengthy treatment relationship with the Plaintiff, the ALJ correctly determined that Dr. Orodio's opinions were far more restrictive than objective evidence on the record supported and his opinion was properly discounted.

Similarly, the ALJ properly afforded Dr. Meisel's opinion some weight despite his expertise in the medical field and familiarity with the Agency disability program for three primary reasons. *Id.* at 25. First, since Dr. Meisel only examined Plaintiff once, he does not qualify as a treating physician; the required criteria also suggest that his opinions should not be

afforded much weight, given his lack of any longstanding medical relationship treating or examining the Plaintiff. Second, Dr. Meisel's findings were generally unsupported by objective medical evidence and treatment history of other treating and examining physicians. *Id.* at 25. For example, although Dr. Meisel found Plaintiff could not even lift or carry ten pounds occasionally, a medical note made several months prior to Plaintiff's visit with Dr. Meisel indicated that Plaintiff was "recently picking up heavy boxes and placing [them] on [a] shelf." *Id.* at 25-26, 108. Further, Dr. Meisel's finding was inconsistent with his own statement that Plaintiff has only moderate issues lifting and carrying. *Id.* at 26. Third, as the ALJ noted, Dr. Meisel's evaluations seemed to rely primarily on Plaintiff's self-reporting, which contradicted objective medical evidence in the record. *Id.* Given the combination of inconsistencies in the record, Dr. Meisel's lack of treating relationship with Plaintiff, and his status as an expert, ALJ Grossman's decision to accord his opinion only some weight was appropriate.

### III.  The Presiding ALJ was Properly Appointed

Plaintiff's final argument in the alternative is that this matter should be remanded because the presiding ALJ was improperly appointed pursuant to the Appointments Clause of the Constitution. The Supreme Court recently held "only the President, a court of law, or a head of a department" can appoint officers of the United States. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018)). Although *Lucia* concerned SEC judges, Social Security ALJs can be similarly classified as inferior officers under the Appointments Clause since they have the power to "take testimony, conduct [hearings], rule on the admissibility of evidence, and have the power to enforce compliance" with their orders. *Id.*

In *Lucia*, the Supreme Court held "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to

16

relief" – a hearing before a different ALJ. *Bonilla-Bukhari v. Berryhill*, 357 F.Supp.3d 341, 350 (S.D.N.Y. 2019) (quoting *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2055 (2018)). A timely challenge, according to *Lucia*, means one that was raised during administrative proceedings, either before the ALJ or the Appeals Council. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2055 (2018). A case decided last year by this court cited a "vast majority" of courts who have considered the Appointments Clause issue post-*Lucia* and found that exhaustion of the issue before the ALJ is required in order to satisfy the "timely" requirement. *Bonilla-Bukhari v. Berryhill*, 357 F.Supp.3d 341, 351 (S.D.N.Y. 2019). This constitutes a nearly wholesale rejection of Plaintiff's partial reliance on *Freytag*, which suggests that "Appointments Clause objections [fall] in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Freytag v. C.I.R.*, 501 U.S. 868. 878-9 (1991).

*Freytag*'s reasoning was also eroded by a later Supreme Court decision emphasizing the practicality of enforcing Appointments Clause challenges at the administrative stage to prevent an influx of strategic constitutional challenges raised only if the administrative outcome is unfavorable. *See Ryder v. United States*, 515 U.S. 177, 182-83 (1995). Consistent with the rulings of this Court and binding precedent, Plaintiff has waived her ability to challenge the presiding ALJ's appointment because she did not raise this challenge during the administrative process.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings is **DENIED**; Defendant's Cross Motion for Judgment on the Pleadings is **GRANTED**; and the Commissioner's decision is **AFFIRMED**.

17

SO ORDERED.

Dated: March 10, 2020
     New York, New York

                                    ANDREW L. CARTER, JR.
                                    United States District Judge